Filed 6/13/23  P. v. Farwell CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Tehama)

----

| | |
|---|---|
| THE PEOPLE, | C095434 |
| Plaintiff and Respondent, | (Super. Ct. No. 18CR002207) |
| v. | |
| ROBERT WILLIAM FARWELL, | |
| Defendant and Appellant. | |

Over the course of five days, defendant Robert William Farwell repeatedly abused his wife A.F. mentally, physically, and sexually.  A jury found him guilty of a multitude of offenses, including torture, attempted voluntary manslaughter, criminal threats, spousal rape, forcible sodomy, and forcible sexual penetration with a foreign object, among several other offenses.  He was sentenced to seven years to life plus 38 years six months in state prison.

1

On appeal, defendant contends: (1) insufficient evidence supports his attempted voluntary manslaughter conviction because the evidence shows only that he intended to torture an admission of infidelity out of his wife, not that he intended to kill her; (2) under Penal Code section 654,[1] he cannot be punished for torture and all three sexual offenses because he harbored the same intent for each offense and the sexual offenses were part of the torture he inflicted; (3) section 654 also prohibits multiple punishment for his attempted voluntary manslaughter and criminal threats convictions because the prosecutor relied on the criminal threats to prove his intent to kill for the voluntary manslaughter offense; (4) the matter must be remanded for resentencing under newly amended section 654, which applies retroactively and no longer requires the court to impose the longest possible term; and (5) that his upper term sentences on counts 2, 11, 12, and 13 must be vacated and his case remanded for resentencing in light of Senate Bill No. 567's (2021-2022 Reg. Sess.) (Senate Bill 567) amendments to section 1170, subdivision (b).

We conclude sufficient evidence shows defendant intended to kill A.F. by smothering her, and that the trial court properly imposed unstayed sentences on his torture and three sexual offense convictions, as well as on his attempted voluntary manslaughter and criminal threats convictions. We find, however, that the court erred in imposing one-third the midterm sentences on count 5 and count 6, and then staying those sentences under section 654, rather than imposing and staying full terms for those offenses. We further conclude the upper term sentences on counts 2, 11, 12, and 13, although valid when imposed, no longer comport with Senate Bill 567's sentencing requirements. Accordingly, we shall remand for resentencing where the court may apply amended sections 654 and 1170, but otherwise affirm the judgment.

---

[1] Undesignated statutory references are to the Penal Code.

2

BACKGROUND

After being in a relationship for nearly a decade, defendant and A.F. married in 2017; they shared one son together, two-year-old G.F. A.F. had two teenage sons from a previous marriage who also lived with the family.

On the night of August 1, 2018, David K. awoke to A.F., his next door neighbor, pounding on his bedroom sliding glass door. A.F. looked "distraught" and "like she had been through a meat grinder[;]" she was "bruised and hurting . . . ." A.F. borrowed David's phone to call law enforcement. She told David that defendant had beaten her for the last few days.

Tehama County Deputy Sheriff Dustin Maria responded to A.F.'s domestic violence call. The deputy detained defendant outside his home after he initially refused to cooperate, and then contacted A.F. at David's house. According to Deputy Maria, A.F. was emotional and covered in bruises and abrasions. She was transported to the hospital for treatment.[2] Several photographs taken at the hospital of A.F.'s body showing bruises, a bite mark, and other injuries were admitted and shown at trial.

A.F. testified that in late July 2018 defendant accused her of cheating on him with a neighbor.[3] She denied being unfaithful. Early one morning before work, defendant asked A.F. to open the driveway gate for him. She moved the gate and defendant accelerated his car directly at her; A.F. jumped out of the way to avoid being hit. Defendant got out of the car and yelled at A.F. for moving. He then kneed her in the stomach so hard that she urinated and fell to the ground. Defendant picked her up, hit her and ordered her back into the house. Defendant then left for work.

---

[2]     A.F.'s sons testified that when they saw A.F. at the hospital, she was covered in bruises, limping, and holding her right hand.

[3]     The events described generally occurred between July 28, and August 1, 2018.

3

When defendant returned from work hours later, he was irate and accused A.F. of cheating on him with her 17-year-old son, which she denied. Defendant became enraged when G.F., his and A.F.'s toddler son, dropped something, so defendant pushed the child and repeatedly kicked him down the hallway. As a result, the child had "an immediate goose egg" on his forehead.

Defendant then made A.F. go into their bedroom, which had an adjoining bathroom. Except for one time, he did not allow her to leave the bedroom for the next several days. Defendant kept A.F.'s purse, cell phone, computers, her sons' cell phones, and the house phone inside a gun safe so she could not contact anyone for help.

Once in the bedroom, defendant, who was approximately six feet one inch tall and weighed 256 pounds, beat and had sexual intercourse with A.F., who was about five feet three inches tall and weighed 125 pounds, multiple times against her will. Defendant first hit A.F. with his hands, and later with a small bat he had nicknamed the "raccoon basher." He beat her on and off throughout the rest of the day and into the night.

In the morning, defendant ordered A.F. to take a bath with epsom salts to heal her bruises. Defendant repeatedly told A.F. she was no good and that she should die because she was worthless; he also continued to accuse her of being unfaithful and he beat her at least three times in between soaking in the bath. While naked in the bathroom, defendant brought A.F.'s teenage sons in and told them, "This is what a whore looks like."

At one point while A.F. was bathing G.F. in the attached bathroom, defendant shoved A.F.'s head into the bathroom tile, cutting her head. As she bled and G.F. cried, defendant held G.F.'s head under the bath water. Defendant released G.F. and then bit A.F.'s shoulder. After taking G.F. out to his brothers, defendant returned and shoved A.F.'s head into the toilet, telling her she was a "piece of shit" and that she only deserved dirty toilet water.

Later, when A.F. was on the bathroom floor, defendant stomped on her. Defendant continued to hit her in the head and torso area and, after she started bleeding,

4

defendant threw her in the bath and ordered her to clean up. When the bathtub was filled with water, defendant pushed A.F. under the bath water while stating, "You want to die, don't you."

At some point, defendant shoved A.F. on the bed and rolled her over on her stomach smothering her head in the pillows. Defendant stuck his knee in her back, preventing her from breathing or moving. As she gasped for air, defendant bent her knee back towards her head and she felt her toes touch her hair. Defendant then pulled her hair, wrenching her neck backwards. Defendant continued to accuse her of cheating and shoved her head into the pillows again. A.F. could not breathe and she was in a lot of pain.

Although A.F. could not precisely recall what defendant said at the exact moment he was smothering her, she testified that throughout the entire ordeal defendant had threatened to kill her as well as her sons (by slitting their throats) and other extended family members. She was afraid because she believed defendant was serious. At some point, defendant threatened to cut off A.F.'s legs and arms, leaving her a "stump" that her sons would not recognize, and he also threatened to gouge out her eyes while he put his thumbs in her eye sockets as she screamed and tried to get away. Defendant threatened to bite off A.F.'s nose and bit her nose so hard that it left bite marks that bled.

The beatings continued over the next several days. So did the sexual assaults. After beating her on one occasion, defendant inserted a sexual toy into A.F.'s vagina while he had anal intercourse with her as she cried and screamed in pain, begging him to stop. Defendant told A.F. to "[t]ake it like the whore you are." Another time, defendant hit her on the head with a large three-wick candle in a glass jar. He also injured her knee and bent her right hand back so far that it popped and A.F. felt a burning sensation up her arm; she lost all sensation in her right hand. She was later diagnosed with carpal tunnel syndrome because of the incident and required surgery on her right hand and wrist.

5

Both of A.F.'s teenage sons testified that at the end of July to the beginning of August 2018, they rarely saw their mother, although they could hear commotion and screaming coming from the bedroom and bathroom. One of A.F.'s teenage sons also confirmed that defendant had accused him of having sexual relations with A.F., and that when he denied it, defendant accused him of lying, smacked him in the head, and kneed him in the stomach.

Throughout the ordeal, defendant only allowed A.F. to leave the bedroom once to go to the bank to make a payment. Defendant permitted A.F. to take G.F. with her, but her 17-year-old son remained at the house with defendant so A.F. felt she could not seek help for fear that defendant might harm him. On the night of August 1, however, defendant left the bedroom for a short period of time and A.F. escaped and ran to her neighbor's house for help.

Defendant did not testify, but he called A.F.'s former friend, Heather O., to testify on his behalf. Heather's husband had worked with defendant for several years. Heather saw A.F. and two of her sons shortly after the incident and neither A.F. nor her sons appeared injured. To Heather, A.F. did not appear upset or stressed out; instead, she was excited to be building pool furniture.

The jury found defendant guilty of torture (§ 206—count 1); attempted voluntary manslaughter as a lesser included offense of attempted murder (§§ 664, 192, subd. (a)—count 2); two counts of child abuse (§ 273a, subd. (a)—counts 3 & 4); assault with a deadly weapon (a candle in a glass jar) (§ 245, subd. (a)(1)—count 5); corporal injury on a spouse (§ 273.5, subd. (a)—count 6); criminal threats (§ 422, subd. (a)—count 7); false imprisonment by violence (§ 236—count 8); misdemeanor resisting or obstructing a peace officer (§ 148, subd. (a)(1)—count 9); spousal rape (former § 262, subd. (a)(1)—count 11); sodomy by means of force (§ 286, subd. (c)(2)(A)—count 12); and sexual

penetration by a foreign object by means of force. (§ 289, subd. (a)(1)(A)—count 13.)[4] As to counts 2 and 6, the jury found defendant had inflicted great bodily injury during circumstances of domestic violence. (§ 12022.7, subd. e).)

The trial court sentenced defendant to state prison for seven years to life for torture, plus a determinate term of 38 years six months for the remaining offenses. Defendant received the upper term of five years six months on count 2 (attempted voluntary manslaughter), plus an additional upper term of five years for the great bodily injury enhancement; one year four months (one-third the midterm) each on counts 3 and 4 (both child abuse); eight months (one-third the midterm) each on count 7 (criminal threats) and count 8 (false imprisonment by violence); and full consecutive upper terms of eight years each on count 11 (spousal rape), count 12 (sodomy by means of force), and count 13 (sexual penetration by a foreign object by means of force). Under section 654, the court imposed and stayed one-third the midterm sentences on count 5 (assault with a deadly weapon), count 6 (corporal injury on a spouse), and on the great bodily injury enhancement found true as to count 6.

Defendant timely appealed.

## DISCUSSION

Defendant raises evidentiary as well as sentencing issues. We first address the evidentiary issue before considering defendant's multiple sentencing challenges.

### I

*Sufficiency of the Evidence of Intent to Kill*

Defendant contends insufficient evidence supports his attempted voluntary manslaughter conviction because the evidence demonstrated that he intended to keep

---

[4]    The jury found defendant not guilty of assault with a deadly weapon or any lesser included offense as alleged in count 10.

7

A.F. alive to extract a confession of infidelity rather than that he intended to kill her. We are not persuaded.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 701.) "We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*Ibid*.) In doing so, we presume " 'in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Ibid*.) "This standard applies whether direct or circumstantial evidence is involved." (*People v. Catlin* (2001) 26 Cal.4th 81, 139.)

Defendant was found guilty of attempted voluntary manslaughter as a lesser included offense of attempted murder based on having forced A.F.'s face into the pillows on their bed and holding her there. Because an attempt requires the specific intent to commit the target offense, attempted voluntary manslaughter, like attempted murder, requires an intent to kill. (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1549; *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 710 ["attempted voluntary manslaughter cannot be premised on the theory defendant acted with conscious disregard for life, because it would be based on the 'internally contradictory premise' that one can intend to commit a reckless killing"].) An intent to kill may be inferred from a defendant's acts and the circumstances of the crime. (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

Here, the evidence that defendant subjected A.F. to forceful smothering, together with the circumstances surrounding defendant's commission of the crime, amounted to substantial evidence from which the jury could properly infer that defendant acted with the specific intent to kill. According to A.F., defendant forced her face down into the

8

pillows on their bed while shoving his knee into her back, holding her down. The pillows covered her face, obstructing her ability to breathe through her nose and mouth, and defendant's knee made it impossible for A.F. to lift herself up to catch her breath. The application of force over a victim's nose as well as her mouth is an act consistent with the intent to kill her by blocking her nasal and oral airways, thereby depriving her of oxygen—something absolutely necessary to live. (*People v. Bolden* (2002) 29 Cal.4th 515, 561 ["defendant could have had no other intent than to kill" when he plunged the knife deeply into a "vital area of the body of an apparently unsuspecting and defenseless victim"]; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1552 [intent to kill demonstrated in part by evidence of unprovoked attack that rendered unarmed victim prone and defenseless as the defendant repeatedly stabbed him].)

A victim's personal characteristics, moreover, can be relevant to discerning an intent to kill from the particular acts of violence perpetrated on the victim. (*People v. Osband* (1996) 13 Cal.4th 622, 682-683.) In *Osband*, for example, our Supreme Court emphasized the 66-year-old rape and murder victim's "elderly," " 'tiny,' " and "osteoporotic" state in finding that a stab wound in her neck was overwhelming evidence of an intent to kill such that the trial court's failure to instruct the jury on the need to find the defendant acted with the specific intent to kill was harmless. (*Ibid*.) Similarly, in this case, defendant weighed more than twice as much as A.F. and was nearly a foot taller than her. The overwhelming size difference between defendant and A.F. made it impossible for A.F. to escape defendant or remove his knee from her back as her face was held down in the pillows and she struggled to breathe.

We reject defendant's contention that insufficient evidence shows he intended to kill A.F. because had he *actually* wanted to kill her during the smothering act, nothing prevented him from doing so given their extreme size differential. The degree of the resulting injury, or lack of injury, we note, is not dispositive of defendant's intent. Indeed, a defendant may properly be convicted of attempted murder when no injury

9

results.  (See *People v. Stone* (2009) 46 Cal.4th 131, 135-136.)  Thus, the fact that A.F. did not actually die does not mean defendant did not intend to kill her when he smothered her.

Defendant also contends that there was an alternative explanation other than the intent kill because he may have merely wanted to coax a confession of infidelity out of A.F.  But even if the circumstances might also reasonably support a finding that he intended to elicit a confession from her, that alone does not justify reversing the judgment for insufficient evidence where the circumstances, discussed above, also reasonably support the jury's intent-to-kill finding.  (*People v. Farnam* (2002) 28 Cal.4th 107, 143 ["if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding"].)  Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that defendant intended to kill A.F. when he forced her face into the pillows, preventing her from breathing.  (*Id.* at pp. 142-143.)

II

*Section 654*

Having found no error affecting defendant's convictions, we turn to defendant's contention that section 654 precluded the trial court from imposing unstayed sentences on his three sexual offense convictions (counts 11, 12 & 13) after it imposed punishment for the torture offense (count 1) because the offenses were incident to a single course of conduct and objective.  He further argues that he could not be punished for both attempted voluntary manslaughter (count 2) and making criminal threats (count 7) because the prosecutor invited the jury to find he acted with the intent to kill for the manslaughter offense based on the threats.  And, finally, he seeks remand for resentencing under amended section 654, which no longer mandates imposition of the longest possible sentence where the statute applies.

10

Because we will remand the matter for resentencing on a different basis, discussed *post*, we agree amended section 654 would apply upon remand. We otherwise reject defendant's section 654 contentions because sufficient evidence supports the trial court's express and implied findings that defendant harbored multiple intents and objectives in carrying out the various crimes even if the crimes shared common acts.

A.    *Legal background*

Section 654 prohibits multiple punishment when a defendant is convicted of several crimes based on a single act or omission. (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) It also applies when a defendant's indivisible course of conduct violates multiple statutes. (*People v. Corpening* (2016) 2 Cal.5th 307, 311-312.) As amended effective January 1, 2022, the statute provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision. . . ." (§ 654, subd. (a); Stats. 2021, ch. 441, § 1.) Where section 654 applies, "the trial court must impose a full term and stay execution of that term." (*People v. Relkin* (2016) 6 Cal.App.5th 1188, 1198.)

"The initial inquiry in any section 654 application is to ascertain the defendant's objective and intent. If he entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.)

Whether a defendant had separate objectives is a factual determination made by the trial court at the time of sentencing. (*People v. Kopp* (2019) 38 Cal.App.5th 47, 91, review granted Nov. 13, 2019, S257844.) The trial court is given wide latitude under section 654 to make this determination, and we must uphold the trial court's findings of separate objectives so long as there is any substantial evidence to support it when viewing

11

the evidence in the light most favorable to the sentencing order and presuming the existence of every fact a trier of fact could reasonably deduce from the evidence. (*People v. Kelly* (2018) 28 Cal.App.5th 886, 903; *In re L.J.* (2021) 72 Cal.App.5th 37, 43 (*L.J.*); *Kopp, supra*, at p. 91.) When the court does not make an express finding on the issue but sentences the defendant to separate terms, we infer a finding that each offense had a separate objective. (*L.J., supra*, at p. 43.)

B.     *Sentencing hearing*

At sentencing, defense counsel argued that every act perpetrated against A.F. was defendant's " 'means of perpetrating' the most serious crime, [t]orture," and therefore, he could only be punished for the torture offense. The prosecutor disagreed, arguing that while count 2 (attempted voluntary manslaughter) and count 6 (corporal injury on a spouse) were subject to section 654, defendant harbored different intents and objectives for the remaining offenses. For the three sexual offenses, the prosecutor specifically argued that defendant's intent and objective was sexual gratification, which differed from his intent to inflict pain and suffering on A.F. for the torture offense. The prosecutor also argued that the criminal threats, which involved threatening A.F. and her family members, and not any sort of physical pain or suffering, did not constitute a part of the torture.

After considering the evidence at trial, the probation report, and the parties' section 654 arguments, the court found torture required an intent to cause cruel or extreme pain for the purpose of revenge, persuasion, or any sadistic purpose, while attempted voluntary manslaughter required an intent to kill, which was a different intent and objective even though both offenses might result in great bodily injury. Given these different intents and objectives, the court found section 654 did not apply to the count 2 attempted voluntary manslaughter offense.

The court then found section 654 applied to both the count 5 assault offense (for hitting A.F. in the head with a candle in a glass jar), and the count 6 corporal injury

12

offense, because the intent and objective for both offenses was similar to the torture offense, but that it did not apply to the criminal threats (count 7), false imprisonment (count 8), or the three sexual offenses (counts 11, 12 & 13), because defendant harbored a different intent and objective for each offense than for the torture offense. Regarding the sex offenses, the court specifically found that defendant's intent and objective included sexual gratification and control.

C. *Torture, spousal rape, sodomy by force, and sexual penetration by a foreign object convictions*

Defendant argues the court erred in declining to stay the sentences for the rape, sodomy, and sexual penetration offenses after imposing punishment for the torture offense because the prosecution relied on the forcible sexual assaults as part of the course of conduct constituting the torture. He cites, in particular, the prosecutor's closing argument that "[t]he constant repeated beatings, the constant rapes, clearly was establishing that he was doing it for his own pleasure. [¶] I want you to particularly pay attention to Count 1, torture, and see if what you heard matches up with these instructions—beatings, rapes, threats, sodomy, injury to the wrist, shoving her head under water in the toilet and in the tub; and I don't see how you can avoid the conclusion that we have established beyond any reasonable doubt all the elements necessary for torture."

To support his position, defendant also relies on *People v. Mejia* (2017) 9 Cal.App.5th 1036, where the defendant was convicted of torture, spousal rape, spousal abuse, and criminal threats, and the court imposed unstayed terms for each offense. (*Id.* at p. 1039.) The *Mejia* court held that the trial court violated section 654 by failing to stay execution of the sentences imposed on the spousal rape and spousal abuse counts because the conduct underlying those crimes was conduct the prosecutor relied on to prove torture. (*Mejia, supra*, at pp. 1044-1045.) While the court found that the defendant could be convicted of both torture and of any or all of the underlying acts (*id*. at p. 1044), "section 654 preclude[d] imposition of unstayed sentences for both torture and any of the

13

underlying assaultive offenses upon which the prosecution relie[d] to prove that element." (*Id*. at pp. 1044-1045.) It was irrelevant, in the court's view, whether defendant harbored a single objective or multiple objectives, because the prosecution relied upon each act of spousal rape and each act of infliction of corporal injury on a spouse as the intentional acts underlying the torture conviction. (*Id*. at p. 1045.) By contrast, the *Mejia* court rejected the defendant's contention that his consecutive sentence on his criminal threats conviction violated section 654, reasoning, in part, that "mentally or emotionally terrorizing the victim by means of threats is an objective separate from the intent to cause extreme physical pain. Accordingly, a reasonable trier of fact could conclude that the criminal threats were in furtherance of a separate criminal objective." (*Id*. at p. 1047.)

While the People concede the sexual assaults were committed during the same time span as the torture, they argue *Mejia* is distinguishable because unlike in *Mejia*, the sexual assaults here were not essential to establishing torture. Rather, the trial court could have found that the sexual offenses, which defendant perpetrated for sexual pleasure, were separate from the torture defendant inflicted to cause cruel pain. We agree.

Although defendant urges us to rely on the prosecutor's closing remarks to the jury in making our determination, neither we nor the trial court are bound by the prosecutor's closing argument in determining whether a sentence must be stayed under section 654. (See *People v. Leonard* (2014) 228 Cal.App.4th 465, 500 [trial court not bound by prosecutor's statements during closing argument when making section 654 decisions].) Our task is to review the trial court's finding of separate objectives, not the prosecutor's theory of the case. In any event, while the prosecutor did briefly reference the sexual offenses when discussing the torture charge, we note that his closing argument did not suggest that the acts providing the factual basis for counts 11, 12 and 13 were the *only* acts that could provide the factual basis for the torture offense. On the contrary, to

14

meet the elements for torture, the prosecutor focused primarily on the beatings A.F. endured, which resulted in significant bruising and abrasions, as well as injuries to her wrist and knee.

Regardless of the prosecutor's closing argument, the acts of rape, sodomy, and sexual penetration were not essential to establishing the torture offense. To commit torture, the defendant must intend to cause "cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (§ 206.) Defendant's repeated acts of beating, stomping, and biting A.F. on the same areas of her body over the course of five days to cause extreme pain for revenge and his sadistic gratification, were sufficient to establish the elements of torture.

The evidence at trial, moreover, amply shows the trial court reasonably could conclude that the rape, sodomy, and sexual penetration offenses were not committed with the same intent and objective as the torture. A.F. testified that defendant complained she was not "wet" enough and that she could not "turn him on" when defendant initially raped her. He later complained that it was her fault that he was "pushing a limp noodle" during the rapes. Based on this evidence, the trial court reasonably could find that defendant forced A.F. to have sexual intercourse for his own sexual gratification rather than to inflict cruel pain upon her, and that he blamed her for her lack of lubrication or ability to help him achieve an erect penis during intercourse, which impeded his sexual pleasure. Likewise, there was evidence that prior to the five-day ordeal, defendant had purchased a sex toy without asking A.F., and that they had used a sex toy together once or twice, although A.F. testified she did not like using it. From this evidence, the trial court reasonably could infer that defendant derived sexual pleasure when using the sexual device he had purchased, and that he did so while sodomizing her for his own sexual gratification because it was something he himself enjoyed.

Sufficient evidence, and reasonable inferences from that evidence, thus support the trial court's determination that defendant harbored a separate intent and objective in

15

sexually assaulting his wife in multiple ways—for his own sexual pleasure and control—than he did when torturing her for the purpose of causing extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose. The trial court did not err in declining to stay the sentences on counts 11, 12 and 13 under section 654.

      D.    *Attempted voluntary manslaughter and criminal threats convictions*

Defendant contends that under section 654 the trial court could not lawfully sentence him for both attempted voluntary manslaughter (count 2) and criminal threats (count 7) because the prosecutor invited the jury to find that defendant acted with the intent to kill necessary for count 2 by arguing that "[h]e was constantly telling her that he was going to kill her and the children." Based on the prosecutor's argument, defendant reasons that he acted with the same criminal intent in committing both crimes. That is, the threats supplied the necessary element of intent to kill required for the commission of the attempted voluntary manslaughter offense in count 2, thereby precluding punishment for both counts.

Although the trial court analyzed whether section 654 prohibited punishment for both torture and criminal threats, it did not explicitly address whether the statute precluded multiple punishment for attempted voluntary manslaughter and criminal threats. We thus assume the trial court impliedly found defendant had separate objectives in committing the attempted voluntary manslaughter and criminal threats offenses because it imposed an unstayed sentence on each count. (*L.J., supra*, 72 Cal.App.5th at p. 43.)

As previously explained, we are not bound by the prosecutor's theory of the case in determining whether the trial court properly applied section 654. That the prosecutor may have referenced evidence of one of defendant's criminal threats when discussing the attempted voluntary manslaughter offense during closing is therefore not dispositive of the issue we must resolve, namely, whether substantial evidence supports the trial court's

16

implied finding of separate intents. (*People v. Leonard, supra*, 228 Cal.App.4th at p. 500; *People v. Green* (1988) 200 Cal.App.3d 538, 543-544 & 545, fn. 5.)

The record amply supports the trial court's implied finding that defendant committed the criminal threats offense with a different intent and objective than the intent to kill required for the attempted voluntary manslaughter offense. Attempted voluntary manslaughter requires the prosecution to prove that the defendant harbored an intent to kill based on provocation (§ 192, subd. (a)), while a criminal threats charge requires that the prosecution prove that the defendant willfully threatened to kill or seriously injure the victim with the specific intent that the statement be taken as a threat. (§ 422.) These two offenses clearly involve different intents.

And defendant's threats were not essential to establish the elements of the attempted voluntary manslaughter offense. The evidence showing defendant shoved A.F.'s head into the pillows on their bed while kneeing her in the back, thereby preventing her from removing her mouth and nose from the bedding, cutting off her ability to breathe, alone was sufficient to establish the attempted voluntary manslaughter. The court therefore reasonably could determine that defendant acted with a separate intent when making the criminal threats to kill or seriously injure or maim her by cutting off her arms and legs to leave her as a "stump" that her sons would not recognize, gouging out her eyes, and biting off her nose—to scare A.F. so she would not try to escape and seek help, or to otherwise control her actions. Because substantial evidence supports the trial court's implied finding under section 654, it did not err by imposing sentences for both attempted voluntary manslaughter and criminal threats.

E.    *Unauthorized sentences on count 5 and count 6*

Although not raised by defendant on appeal, we have identified a sentencing error that requires correction. After finding that section 654 applied to both count 5 (assault with a deadly weapon) and count 6 (corporal injury on a spouse), the trial court imposed one-third the midterm sentences for both counts and for the great bodily injury

17

enhancement attached to count 6, and then stayed the sentences under section 654. This was error, which resulted in an unauthorized sentence. (*People v. Cabrera* (2018) 21 Cal.App.5th 470, 477 [a court with jurisdiction may correct an unauthorized sentence at any time].)

"The one-third-the-midterm rule of section 1170.1, subdivision (a), only applies to a consecutive sentence, not a sentence stayed under section 654." (*People v. Cantrell* (2009) 175 Cal.App.4th 1161, 1164.) When a sentence is required to be stayed under section 654, the trial court should impose a full-term sentence to ensure the "defendant's punishment is commensurate with his criminal liability" if the stay is lifted. (*Ibid*.) Accordingly, upon remand, the trial court must impose a full term on any count that it stays under section 654. (*Ibid*.)

F.      *Retroactivity of amended section 654*

When defendant was sentenced in December 2021, former subdivision (a) of section 654 required that a defendant who committed an act punishable by two or more provisions of law be punished under the provision that provided for the longest possible term. (Stats. 1997, ch. 410, § 1.) Effective January 1, 2022, Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill 518) amended subdivision (a) of section 654 to permit an act or omission punishable under two or more provisions of law to "be punished under either of such provisions." (§ 654, subd. (a); Stats. 2021, ch. 441, § 1.) Thus, under newly amended section 654, a trial court now has the discretion to punish the defendant under any of the applicable laws.

Defendant asserts that we must remand his case for resentencing under Assembly Bill 518 so the trial court may exercise its discretion in deciding whether to stay the sentence on his torture conviction rather than on his assault with a deadly weapon and corporal injury offenses. While the People concede that Assembly Bill 518 applies retroactively to cases that were not final on Assembly Bill 518's effective date, they argue remand is unnecessary because the trial court plainly indicated it would not impose

18

a lesser sentence by commenting at sentencing that defendant had justly received the sentence he deserved for his cruel and heinous crimes.

We agree Senate Bill 518 applies to defendant's nonfinal case. (*People v. Mani* (2022) 74 Cal.App.5th 343, 379 [a defendant whose judgment is not yet final on appeal is entitled to the ameliorative benefit of Assembly Bill 518, which provides the trial court new discretion to impose a lower sentence].) Given that we are remanding the matter for resentencing under Senate Bill 567, as discussed more fully below, we conclude the trial court should apply section 654 as amended by Assembly Bill 518 upon remand.

III

*Senate Bill 567*

Defendant contends Senate Bill 567 applies retroactively to his case, and that none of the aggravating factors the trial court cited in selecting the upper term on counts 2, 11, 12, and 13 comply with Senate Bill 567. The Attorney General concedes Senate Bill 567 is retroactive (*People v. Garcia* (2022) 76 Cal.App.5th 887, 902; *In re Estrada* (1965) 63 Cal.2d 740, 744-745), but argues any error in satisfying Senate Bill 567's new sentencing requirements was harmless. We conclude defendant's upper term sentences do not comport with Senate Bill 567, and that remand is necessary for resentencing.

A.    *Senate Bill 567's amendments to section 1170*

When defendant was sentenced in December 2021, section 1170, subdivision (b) provided that when a judgment of imprisonment is to be imposed and the statute authorizes three potential terms, "the choice of the appropriate term shall rest within the sound discretion of the court." (§ 1170, former subd. (b); Stats. 2020, ch. 29, § 14.) Effective January 1, 2022, Senate Bill 567 changed the requirements for proving

19

aggravating circumstances and altered sentencing discretion under section 1170, subdivision (b).[5] (Stats. 2021, ch. 731, § 1.3.)

Relevant here, Senate Bill 567 amended former subdivision (b) of section 1170 by making the middle term the presumptive sentence for a term of imprisonment unless there are circumstances in aggravation that justify a term exceeding the midterm and the facts underlying those circumstances in aggravation are stipulated to by the defendant, proven to a fact finder beyond a reasonable doubt, or established by a certified record of conviction. (§ 1170, subd. (b)(1)-(3).) Senate Bill 567 also added new subdivision (b)(6) to section 1170, which now provides that the trial court shall impose the lower term if certain factors contributed to the commission of the offense, including that a defendant "has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence," unless the court finds that the aggravating circumstances outweigh the mitigating circumstances such that imposition of the lower term would be contrary to the interests of justice. (§ 1170, subd. (b)(6)(A).)

B.     *Upper term sentences*

Prior to sentencing, defense counsel asked the court to consider as a mitigating circumstance abuse defendant himself suffered and how that affected his "entire life, his psyche, [and] his behavior." Defendant submitted letters from two of his siblings documenting the abuse he suffered growing up, which he asserted affected him greatly.

At the sentencing hearing, the trial court initially denied defendant probation, agreeing with the probation report's assessment that the victim was particularly vulnerable, that her physical injuries were extensive, that she suffered immeasurable emotional injuries, and that defendant took advantage of a position of trust. It then found

---

[5]     Effective January 1, 2023, Assembly Bill No. 960 (2021-2022 Reg. Sess.) (Stats. 2022, ch. 744, § 1) further amended section 1170, but none of the changes affect the issues raised in this appeal.

that several factors in aggravation, including that (1) the crimes involved great violence; (2) defendant inflicted bodily harm; and (3) the offenses involved a high degree of cruelty, outweighed defendant's prior satisfactory performance on probation and his minimal criminal record. The court concluded: "[G]iven the totality of the situation and the factors listed in the Probation Department's report, those in aggravation outweigh those . . . in mitigation." The court did not address defendant's proffered evidence in mitigation regarding his alleged childhood abuse.

The court chose the upper term of five years six months for count 2 (attempted voluntary manslaughter) plus the upper term of five years for the great bodily injury enhancement found true as to that count. For count 11 (spousal rape), count 12 (sodomy), and count 13 (sexual penetration), the court imposed full, separate, and consecutive upper terms of eight years for each offense under section 667.6, subdivision (d) or, alternatively, under section 667.6, subdivision (c).

In summarizing the basis for its sentencing choices, the court stated that it believed "some crimes have severe punishment for a reason. There are some people that commit such heinous crimes that have such cruelty that they deserve to be imprisoned for as long as the law deems. I find this to be the case, the defendant was cruel to his family, cruel to his wife, and he committed unspeakable acts, those of which [*sic*] a man would not commit. He did in this case and justice is what he is receiving in this sentence."

C.    *Analysis*

Defendant did not stipulate to any of the circumstances underlying the aggravating factors found by the trial court. And to the extent the jury found beyond a reasonable doubt that defendant inflicted great bodily injury, the parties agree the court could not rely on that factor to impose the upper term on count 2, where it also imposed the great bodily injury enhancement on that count. (§ 1170, subd. (b)(5) ["[t]he court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law"]; *People v. Gutierrez* (1992) 10 Cal.App.4th 1729,

21

1735 [the trial court erred by using the fact the crime involved great bodily injury in imposing the upper term where the trial court also imposed a great bodily injury enhancement].)

"[T]o the extent a potential aggravating circumstance at issue . . . rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*People v. Sandoval* (2007) 41 Cal.4th 825, 840.) We find that to be the case here.

Whether A.F. was "particularly" vulnerable, the "extensiveness" and "measurability" of her physical and emotional injuries, and the "level of violence" or "degree of cruelty" of defendant's crimes as compared to other offenses or offenders rest on somewhat "vague or subjective" standards, making it difficult to conclude with confidence that a fact finder would have found the factors true if the proof requirements of amended section 1170 had been applied at sentencing.

Furthermore, the record shows defendant suffered abuse as a child, which might have negatively affected him and contributed to the offenses. Such evidence may now require imposition of the lower term unless the trial court makes specific findings under section 1170, subdivision (b)(6) that the aggravating circumstances outweigh the mitigating circumstances such that imposition of the lower term would be contrary to the interests of justice. (§ 1170, subd. (b)(6).) Given that the trial court did not address defendant's childhood abuse evidence, or otherwise make the requisite findings under subdivision (b)(6), we shall vacate defendant's sentence and remand for resentencing under the newly amended law. (*People v. Sandoval, supra*, 41 Cal.4th at pp. 842-843; *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1115.) We express no opinion as to the appropriate sentence on remand.

## DISPOSITION

The matter is remanded for resentencing pursuant to Assembly Bill 518 for the court to impose full terms on count 5 and count 6, and then exercise its discretion to stay execution of sentence on either count 1, count 5, or count 6 pursuant to section 654 as amended by Assembly Bill 518. At the resentencing hearing, the court shall apply all applicable sentencing laws, including, but not limited to, Senate Bill 567. After resentencing, the trial court is directed to prepare an amended abstract of judgment and forward a certified copy thereof to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.


                                                                         KRAUSE        , J.


We concur:


        DUARTE        , Acting P. J.


        EARL        , J.